UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DENISE HERMAN,

       Plaintiff,

  v.                                CASE NO.: 8:08-CV-1192-T-23MAP

METROPOLITAN LIFE
INSURANCE COMPANY,
a foreign corporation,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff, a managing director for MetLife, was covered by the company's ERISA-governed long-term disability plan. *See* Employee Retirement Income Security Act of 1974 at 29 U.S.C. §§ 1001 *et seq.* After MetLife denied her benefits, the Plaintiff brought this action for judicial review. In turn, MetLife countered with a claim against the Plaintiff under 29 U.S.C. § 1132(a)(3) seeking reimbursement of benefits paid to her. Both sides have moved for summary judgment (docs. 35, 37), and the district judge has referred their motions to me for report and recommendation (doc. 42). *See* 28 U.S.C. §636(b).[1] After considering the motions,

---

[1] Although both sides have moved for summary judgment per Fed. R. Civ. P. 56, it bears mentioning that MetLife alternatively has asked for final judgment under Fed. R. Civ. P. 52. In contrast with Rule 56, Rule 52 invokes a different standard of appellate review: the district judge's factual findings stand unless clearly erroneous. *See* Rule 52(a)(6). This distinction has some traction here because (as the Eleventh Circuit observed in an unpublished decision) the district court in an ERISA benefits denial case "sits more as an appellate tribunal than as a trial court." *Curran v. Kemper Nat'l Servs.,* No. 04-14097, 2005 WL 894840, at *7 (11th Cir. March 16, 2005). This notion prompted the First and the Ninth Circuits to conclude that a summary judgment motion in an ERISA case simply serves as the "vehicle" for deciding a case and the non-moving party is not entitled to the usual Rule 56 inferences. *Bard v. Boston Shipping Ass'n.,* 471 F.3d 229, 235 (1st Cir. 2006); *Bendixen v. Standard Ins. Co.,* 185 F.3d 939, 942 (9th Cir. 1999), *abrogation on other grounds recognized in Montour v. Hartford Life & Acc. Ins. Co.,* ___

the parties' oral arguments, and the administrative record, I conclude that no reasonable

fact-finder could conclude that MetLife erred by deciding the Plaintiff failed to prove her

disability as required by the terms of the plan. Accordingly, I recommend the district judge enter

summary judgment in favor of MetLife on its decision to deny benefits to Plaintiff. However, as

to MetLife's reimbursement counterclaim, the evidence in the record establishes there is no

identifiable fund in existence as to which MetLife would be entitled to assert its claim under 29

U.S.C. § 1132(a)(3). I therefore recommend the district judge enter judgment in favor of

Plaintiff on MetLife's reimbursement counterclaim.

### *A. The Plan*

The starting point for any judicial review is the Plan itself, one where MetLife acted as

its insurer and administrator. (Ex. C at OI-53, OI-56) And the critical terms here, like in most

ERISA cases, are the Plan's definition for disability, its defined standard for fiduciary review,

and its imposition on the insured of the burden of proving her disability:

"***Disabled" or "Disability***" means that due to sickness, pregnancy or accidental injury:

1) You are receiving appropriate care and treatment from a doctor on a continuing basis;

---

F.3d ___, No. 08-55803, 2009 WL 3856933, at *17 (9th Cir. Nov. 19, 2009). The Eleventh Circuit, in another unpublished decision, noted the First and Ninth Circuits positions and commented that a Rule 52 approach "has some practical attraction because there is no right to a jury on ERISA claims." *Mack v. Metropolitan Life Ins. Co.*, 246 Fed. Appx. 594, 595 (11th Cir. 2007). Nonetheless, the *Mack* panel declined to decide the matter and instead applied the typical Rule 56 analysis: "Summary judgment is normally appropriate where no genuine issue of material fact exists, and such an issue exists only where a reasonable fact finder could find in favor of the nonmoving party." *Id.* at 596 (citations omitted). That is the standard applied here. *See Ganceres v. Cingular Wireless Health and Welfare Benefits Plan for Non-Bargained Employees,* No. 3:04-cv-199-J-32HTS, 2006 WL 2644919, at *6 (M.D. Fla Sept. 14, 2006) (discussing Rules 52 and 56 and applying summary judgment analysis in the context of an ERISA case).

2) During the first 12 months of disability, including the period of short term disability, you are unable to earn more than 80% of your pre-disability earnings at your own occupation for any employer in your local economy; and

3) After the first 12 months of disability, including the period of short term disability, you are unable to earn more than 80% of your indexed pre-disability earnings from any employer in your local economy, at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and pre-disability earnings.

Doc. 34, Ex. B, LTD-4, 5. Plan documents further provide:

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Doc. 34, Ex. D at 24)

Importantly, the Plan imposes the burden of proving disability on the insured, and she must present such proof at her own expense. *See* Doc. 34, Ex. D at 16. Failure to do so is reason to deny the claim: an insured "cannot received LTD benefits if…[she] no longer meet[s] the definition of disability as defined by the plan [or she does] not provide adequate proof, *as determined by the insurance company*, that the disability still exists when proof is requested." (Doc. 34, Ex. B at LTD-16 (emphasis added))

*B. The Administrative Record*

In May 2002, Plaintiff was diagnosed with breast cancer. She underwent a partial mastectomy, breast reconstructive surgery, radiation, a course of chemotherapy (Cytoxan, methotrexate, and 5-FU), followed by adjuvant therapy. In September 2002, in the midst of her challenging struggle, Plaintiff applied for long-term disability benefits, which MetLife approved.

(AR 176)[2]  She completed her course of radiation in October 2002 (AR 80) and her

chemotherapy regimen in December 2002.  (AR 283)  Since her successful surgery and

treatment, she has been in remission, although she has suffered from complications.  In the main

her complaints have centered on fatigue, joint pain, and an inability to concentrate.   MetLife's

review of her complaints is the key issue here.

In a June 5, 2003 report, Plaintiff's surgeon, Dr. Vopal, stated in a physician

questionnaire that Plaintiff did not have any limitations from a surgical perspective,[3] but he

would defer to Dr. McKeen, Plaintiff's treating oncologist, as to Plaintiff's estimated date for

returning to work full time.  (AR 240)  In the summer of 2003, Dr. McKeen referred Plaintiff to a

rheumatologist for joint pain. The rheumatologist, Dr. Michael Schweitz, stated in August 2003

his impressions as: "1. Mild osteoarthritis. 2. Arthralgia/early inflammatory arthritis with

significant morning stiffness."  Dr. Schweitz further stated: "Certainly, we have seen patient's

[sic] who develop significant joint pain and sometimes frank synovitis in the post breast cancer

chemotherapy period.  These symptoms often abate, but sometimes progress to resemble frank

rheumatoid disease."  (AR 276)  In a subsequent note dated September 30, 2003, Dr. Schweitz

wrote:

> [Plaintiff] appears to have modest osteoarthritis although the degree of morning
> stiffness in her foot pain are suggestive of an inflammatory arthritis.  Perhaps it is
> related to her chemotherapy. At this time, however, I do not think that we need to be
> more aggressive therapeutically.  I am going to try switching her from Bextra to
> Celebrex 200 mg b.i.d. p.c. with appropriate cautions regarding side effects.  We will

---

[2] The documents in the administrative record contain two bates numbers.  In referring to a
documents as "AR __," the Court is referring to its "Chrono A.R." designation.

[3] The record contains a similar October 2003 report from Plaintiff's plastic surgeon,
Dr. Vinas, stating Plaintiff had no current functional limitations.  (AR 292)

differ [sic] the addition of corticosteroids or second-line drugs for the time being.

(AR 273).

In a September 2, 2003, letter appearing in the claims file, Dr. McKeen articulated

additional side effects she perceived Plaintiff suffered as a result of her treatment:

> Denise's illness including the side effects from her treatments and disease made her
> unable to perform her regular job duties. She suffers from dizzy spells, lack of
> concentration, nausea, pain, all over body aches, chills, sleeplessness, anxiety, fatigue,
> and memory recall issues. These are all common side effects from her treatments
> Unfortunately some of the above named illnesses are still present and it is
> undeterminable when she will be back to her normal self.

(AR 456).

The record is virtually silent as to the state of Plaintiff's health from 2004 and 2005.

Beginning in May 2005, MetLife made many unsuccessful attempts to get Plaintiff and her

doctors to update her records. (AR 22-23, 346, 347) When Plaintiff and her physicians failed

to respond to these efforts, MetLife terminated Plaintiff's benefits in March 2006 on the grounds

that she had not provided proof of her continuing disability.[4] (AR 367-68) In that letter, MetLife

cited the numerous times it had asked Plaintiff to complete forms and to have her physician

complete forms; yet, it still did not have "any documentation to support an ongoing disability."[5]

(AR 368)

A little over a week after the termination of benefits, Plaintiff submitted a completed

---

[4] MetLife originally terminated Plaintiff's benefits in January 2006. However, MetLife
reinstated Plaintiff's benefits to terminate on March 2, 2006, due to MetLife's failure to notify
Plaintiff in writing of the January termination. (AR 367-68)

[5] The Plaintiff's failure to provide proof is puzzling, particularly given that she is a
lawyer by training and had occupied a highly paid position with MetLife. Irrespective, given that
MetLife eventually considered her proof, *infra*, her delay is irrelevant to the judicial analysis.

personal profile form to MetLife.  She stated her side effects from the surgeries, chemotherapy, radiation, and medication included "pain, weakness in limbs, fatigue, inability to concentrate, nausea, irregular body temperature, inability to sleep, bone loss,[6] hearing problems, and neurological issues."  (AR 374)  Plaintiff also stated she was fatigued, needed to rest, had no energy for physical activity, and could not multitask or do physically challenging activities.  (AR 377-78)

On April 14, 2006, Dr. McKeen's office faxed office notes and lab results to MetLife. Among those faxed documents were August 2005 office notes indicating Plaintiff had not tolerated Femara and had switched to Aromasin, which is similar in function to Tamoxifen.  The notes state Plaintiff was tolerating Aromasin well, but tired easily and suffered from stiffness in her back, legs, and hips.  The notes further state Plaintiff has osteoporosis.  (AR 399) The faxed documents additionally included a January 2006 report indicating Plaintiff had a normal whole body PET/CT fusion scan, (AR 389) as well as office notes dated January 3, 2006, indicating Plaintiff had suffered two months earlier from an episode of numbness in one of her feet, but that it was slowly improving, and suffered from left-sided hearing loss.  (AR 392) Plaintiff's medications at that time included Aromasin and Boniva.  Also included in the faxed documents were office notes dated April 10, 2006, indicating Plaintiff was taking Aromasin and further stating Plaintiff was feeling tired and nauseated, was not sleeping well, and lacked energy and stamina.  (AR 391) Finally, the faxed documents included an attending physician statement dated April 14, 2006, in which Dr. McKeen stated she had advised Plaintiff on July 9, 2003, to return

---

[6] A May 2006 bone density test shows Plaintiff has osteoporosis of the femoral neck.  (AR 508)

to her regular or other job full-time.  (AR 394)  Somewhat confusingly, Dr. McKeen further stated that she did not expect improvement in any area and that Plaintiff suffered from permanent limitation.  (AR 394)

In a May 11, 2006 letter, MetLife informed Plaintiff it was adhering to its decision to terminate her benefits.  MetLife summarized the medical evidence, including the January 2006 normal PET/CT Fusion Scan and Dr. McKeen's April 14, 2006, statement indicating Plaintiff was released to return to work full-time at her own or any other occupation as of July 9, 2003.  MetLife further stated:  "We have concluded that, although you may continue to experience some lack of energy and stamina (based on your last evaluation at the Palm Beach Cancer Institute on April 10, 2006), these records do not document them to be of a severity so as to preclude you from performing the material duties of any gainful occupation as required by the policy."  (AR 413)

In September 2006, Dr. McKeen provided MetLife with numerous corrections to her earlier attending physician statement.  Among those corrections, Dr. McKeen stated: "[Plaintiff's] diagnosis has had a significant impact and she still suffers from fatigue, lack of motivation and decreased concentration."  (AR 432)  Dr. McKeen further stated Plaintiff was "NOT advised to return to work on 7/9/2003" as was stated in the earlier form – the statement to that effect in her earlier report was a typographical error.  (AR 432)  Dr. McKeen continued: "Subjective symptoms, resulting from radiation, chemotherapy and adjuvant treatment, as are noted on the corrected Statement, include nausea, fatigue, insomnia, radiation burns, sore throat,

lack of concentration, bone and joint pain, depressions, neutropenia,[7] osteoporosis, broken bones,

symptoms of menopause (hot flashes, aches, lack of focus) anemia, neuropathy and depression."

(AR 431-32)  She also stated:

> With regard to Ms. Herman's physical capabilities, I have amended the Statement to
> reflect that she could probably work a total of four hours per day, given limited energy
> resources and inability to multi-task as required in previous job…. Given the fact that she
> has been fully and permanently disabled for four years, and her physical stamina and
> energy level have been significantly compromised by her illness, she will require some
> transitional support back to work, such as vocational rehabilitation, job modification and
> possibly psychological counseling.

(AR 432)

On September 19, 2006, MetLife sent a letter to Plaintiff setting out the status of

Plaintiff's LTD claim.  Among other things, the letter stated that if Plaintiff disagreed with

MetLife's decision to terminate Plaintiff's claim, Metlife would "need the current office

treatment notes and any diagnostic test results from Dr. McKeen to support her revised opinion."

(AR 438)   Additionally, MetLife had an independent medical consultant, Dr. Wortman, board

certified in internal medicine and oncology, review Plaintiff's file.  (AR 589)  In his December 5,

2006, report, Dr. Wortman noted Plaintiff "was advised to return to work on 07/09/2003, which

[Dr. McKeen] currently denies."  (AR 534)  Dr. Wortman further stated: "The information on file

or obtained from [Dr. McKeen] does not adequately document the presence of ongoing

functional impairment after 03/01/2006.  Subjective complaints such as weakness and tiredness

are all that is mentioned without further evaluations."  (AR 535)  He further stated he could not

---

[7] Neutropenia is a hematological disorder characterized by an abnormally low number of
white blood cells (chiefly neutrophils).  *Merriam Webster's Medical Desk Dictionary* 475 (1993).
A reasonable reading of this note is that Plaintiff's neutropenia was temporally limited to her
chemotherapy as her post-chemotherapy lab values dated August 2003, August 2005, January
2006, and July 2006 show her neutrophil count to be normal.  (AR 279, 398, 390, 530)

"determine from the medical records any restrictions and limitations employee would have as of that date." (AR 535) Finally, he concluded: "There is no specific objective evidence of any functional restrictions or limitations in this patient in the chart as reviewed. The AP has not answered any calls and therefore I could not discuss this with h[er]." (AR 535)

In a December 21, 2006, letter to MetLife, Dr. McKeen summarized Plaintiff's treatment, stating Plaintiff "tolerated the chemotherapy relatively poorly with weakness for the week after chemotherapy. She also had a febrile neutropenia and depression." (AR 553) Dr. McKeen further stated:

> Post chemotherapy [Plaintiff] continued to have severe insomnia, joint pain and complained of difficulty thinking. She was referred to a rheumatologist for morning stiffness. She had severe joint symptoms on FEMARA and AROMASIN was substituted.
>
> On 11/04 our records document continued fatigue and joint aches especially of the knees. From 05/04 thru 04/06 she continued to complain of lack of energy and stamina, persist[e]nt insomnia and menopausal symptoms.
>
> I last saw her on 10/19/06. She complained of lack of energy so severe that she required a nap daily. She continues to have hot flashes and feels she is unable to perform at the level required of her position.
>
> …
>
> Question 2: I have not placed any restrictions or limitations on the employee.
>
> Question 3: The patient's disability relates to the patient['s] fatigue and loss of energy. She states that she requires naps daily and she feels that she is unable to perform her job duties.

(AR 554)

On January 12, 2007, Dr. Wortman issued an updated report, which included consideration of Dr. McKeen's December 21 letter and a conversation he had with Dr. McKeen.

Dr. Wortman noted that since Plaintiff had undergone surgery, radiation, and chemotherapy, "she has complained of weakness, fatigue, depression, pain all over the body, lack of concentration, nausea[,] anxiety and memory disturbances[, but that a]ll of her evaluations have been normal and without signs of disease or recurrence." (AR 558)  Dr. Wortman further stated the additional information he had received did not impact his original conclusions:  "There is no additional objective supporting information on [sic] any functional impairment in the claimant.  Her complaints are subjective with no medical supportive documents.  I feel that the additional information does not adequately support the presence of functional impairments." (AR 558)  In so concluding, Dr. Wortman noted Dr. McKeen agreed "the only information that was available was the claimant stating that she was fatigued and could not work." (AR 559)

In a January 22, 2007, letter to Herman, MetLife informed her that it was upholding its decision to terminate Plaintiff's LTD benefits.  MetLife placed much emphasis on Dr. Wortman's reports and concluded:  "Based upon the medical information in your file and obtained from Dr. McKeen, we find insufficient evidence to support a conclusion that you remained disabled after March 1, 2006." (AR 570)  Plaintiff then filed this action.

C. *Standard of Review*

ERISA does not expressly set forth the appropriate standard of review for actions challenging benefit eligibility determinations under 29 U.S.C. § 1132(a)(1)(B).  *See Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1355 (11th Cir. 2008).  Until recently, the Eleventh Circuit directed district courts through a "well-defined series of steps" in reviewing a decision to deny disability benefits in an ERISA case.  *Tippett v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1231-32 (11th Cir. 2006).   The six steps were:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, end inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, then end the judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Doyle*, 542 F.3d at 1356 (citations omitted).  The Eleventh Circuit's six-step review has, however, been modified in response to the Supreme Court's holding in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), which implicitly overruled the heightened arbitrary and capricious review (step six above).  *See Doyle*, 542 F.3d at 1359.  After *Glenn*, "the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious."  *Doyle*, 542 F.3d at 1360.  "[W]hile the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, *the burden remains on the plaintiff to show the decision was arbitrary*; it is not the defendant's burden to prove its decision was not tainted by self-interest."  *Doyle*, 542 F.3d at 1360 (emphasis added).

*D. Discussion*

*1. the benefits decision*

The medical record in this case is sparse.  In sum, the Plaintiff offered little evidence to support her complaints about joint pain, fatigue, and an inability to concentrate.  Her treating physicians have noted that her therapeutic regimen has been known to cause such complaints.  But her physical examinations have been, in most respects, normal.  None of Plaintiff's treating physicians had imposed any limitations on Plaintiff at the time MetLife terminated her benefits.  Moreover, all of Plaintiff's blood work and PET scans essentially were normal by 2006.  As for Plaintiff's joint pain and stiffness, Plaintiff's rheumatologist stated in August 2003 that Plaintiff had mild osteoarthritis, and in September 2003 that Plaintiff appeared to have modest osteoarthritis, but that there was no need to treat Plaintiff more aggressively, *i.e.*, there was no need to add "corticosteroids or second-line drugs."  There is, moreover, no indication in the record that Plaintiff ever returned to the rheumatologist after September 2003.  In fact, although Plaintiff continued to see Dr. McKeen on a regular basis, there is no evidence that Plaintiff sought from any source additional treatment for, or even explanation of, the pain and fatigue she claims were debilitating.

Dr. Wortman conducted an independent review of Plaintiff's medical records and determined she has no functional impairment.  Although Dr. McKeen expressed a contrary view, her stated opinion changed (purportedly due to errors).  Additionally, Dr. McKeen's reports seem somewhat less persuasive than they otherwise might be due to the fact that her statements of Plaintiff's complications and side effects do not always seem to be limited to those from which Plaintiff was suffering at the time of each report.  For example, Dr. McKeen stated in September

2006 that Plaintiff's subjective symptoms included depression.  Plaintiff, however, informed

MetLife in March 2004 that she had not been depressed for some months. (AR 18)  In September

2006, Dr. McKeen also listed radiation burns, neutropenia, and anemia as symptoms from which

Plaintiff suffered.  However, after she completed her chemotherapy and radiation treatments

these symptoms abated over time.  For example, Plaintiff's more recent blood tests show normal

neutrophil and hemoglobin values, indications that counter any claim that her anemia and

neutropenia continued to plague her.  (AR 279, 398, 390, 530)  Furthermore, unlike in her

September 2006 statement, Dr. McKeen stated in her December 2006 letter that Plaintiff's

disabling symptoms are limited to fatigue and loss of energy.

Plaintiff makes much of the fact that Social Security awarded her disability benefits in

December 2006 and that MetLife failed to address that finding.  As she points out, an

Administrative Law Judge ("ALJ") concluded she had severe impairments of: "invasive lobular

breast cancer, times five surgeries and partial mastectomy; joint pain and fatigue secondary to

medications; anxiety and depression."  (AR 549)  The ALJ noted that although "physical

examination was essentially normal in 2003, treating oncologist, Elizabeth McKe[e]n, M.D., who

has treated the claimant since 2002 has opined the claimant is unable to perform any work

activity due to side effects from her breast cancer treatment, which includes long-term, chronic

fatigue." (AR 550) The ALJ found Plaintiff "generally credible" and her complaints could

reasonably be expected to result from Plaintiff's medically determinable impairment.  (AR 550)

Nonetheless, the ALJ added that Plaintiff would be expected to improve medically and her case

should be reviewed in 18 months.  (AR 551)

While it would have been better if MetLife had addressed the ALJ's decision, MetLife's

failure does not make its decision wrong or even unreasonable. The legal principles controlling the Social Security analysis are different from those governing the ERISA analysis. For example, whereas a treating physician's opinion is given priority in the Social Security context, the same is not true in the ERISA context. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833-34 (2003). Moreover, in contrast to Social Security's administrative file, the MetLife claims file includes additional and more recent information (*e.g.*, Dr. Wortman's review including his conversation with Dr. McKeen, and Plaintiff's denial of depression). Lastly, the ALJ seemed to misunderstand the time line for Plaintiff's treatment. The ALJ stated Plaintiff had her partial mastectomy completed in April 2004. Although Plaintiff had some reconstructive surgeries in early 2004, her mastectomy was in 2002.

Plaintiff also argues that MetLife erred by its singular focus on objective evidence, particularly when it failed to put her notice that it required such evidence. I find that contention to be without merit. First, I do not read MetLife's requests for proof to be so myopic. The Plan imposes on the insured the burden to "provide adequate proof, *as determined by the insurance company*, that the disability still exists when proof is requested." (Doc. 34., Ex. B at LTD-16 (emphasis added)). Besides, as the Eleventh Circuit has stated, albeit in an unpublished decision, that "where [as here] the plan puts the burden on the claimant to prove that she is disabled, it is implicit in the requirement of proof that the evidence be objective." *Watts v. BellSouth Telecommunications, Inc.*, 218 Fed. Appx. 854, 856 (11th Cir. 2007) (citation omitted).

Nor do I find that MetLife wrongly evaluated the Plaintiff's subjective evidence. Admittedly, the Eleventh Circuit has recognized that "the only evidence of a qualifying disability may sometimes be the sort of evidence that [plan administrators] characterize as 'subjective,'

such as physical examinations and medical reports by physicians, as well as the patient's own reports of his symptoms." *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1196 (11th Cir. 2007) (citation omitted), *reh'g granted and opinion vacated in part on other grounds by*, 506 F.3d 1316 (11th Cir. 2007); *see also Lee v. BellSouth Telecommunications, Inc.*, 318 Fed. Appx. 829, 837 (11th Cir. 2009) (stating there is "no laboratory dipstick test to diagnose chronic pain syndrome" (citation omitted)). But the evidence the Defendant presented as to the intensity of her fatigue and pain is limited to her complaints memorialized in her physicians' progress notes. MetLife did not ignore these complaints and the objective evidence she presented, namely that her particular treatment for breast cancer can present the symptomatology she described. Rather, MetLife determined, after a review of the record before it, that Plaintiff had offered insufficient evidence to prove her symptoms were so severe as to make her disabled as defined under the Plan. MetLife mainly based this decision on its consulting oncologist, who opined Plaintiff's complaints were "subjective with no medical supportive documents." (AR 559) But in the ERISA context, it is not error to rely on the "opinion of a qualified consultant who neither treats nor examines the claimant, but instead views the claimant's medical record." *Murray v. Hartford Life &Accident Ins. Co.*, 623 F. Supp. 2d 1341,1350 (M.D. Fla. 2009) (citation omitted). In sum, based on the medical record before me, MetLife's decision to terminate Plaintiff's benefits was not wrong.[8]

Even if I were to assume MetLife's benefits decision was wrong, and factor into my

---

[8] Plaintiff argues it is error to terminate benefits without assessing whether Plaintiff was able to make 80 percent of her pre-disability earnings. That analysis, however, is relevant only if Plaintiff had established her ability to work was impaired. Plaintiff did not show such impairment.

analysis its conceded conflict of interest,[9] MetLife's decision was not unreasonable.  *See White v. Coca-Cola* Co., 542 F.3d 848, 856 (11th Cir. 2008) ("As long as a reasonable basis appears from the decision of the Committee, it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision" (citation and quotation omitted), *cert. Denied*, 129 S. Ct. 1910 (2009).  MetLife gave Plaintiff considerable leeway to present her proof.  It paid her benefits during 2004 and 2005 in the absence of her presenting proof of a continuing disability; it offered her the opportunity to present more evidence after its initial decision denying her benefits; it considered that evidence; and it revised its initial decision and judged her claim on the merits of the available medical record.[10]  In sum, for the reasons previously stated, I find that no reasonable fact-finder could conclude that the plan administrator's decision was unreasonable.

### 2.  Plaintiff's accounting claim

In her complaint, Plaintiff asserted a claim under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(1)(B), for an accounting of pension credits in the event she was successful on her benefits claim.  This issue is moot given her failure to prevail on the benefits issue.  Besides, even if she had succeeded on her benefits claim,  Plaintiff acknowledges "she is not yet aware of credits being improperly credited to her and no dispute yet exists."  (Doc. 44 at 9.)  As such, there would be no case or controversy before the Court.

---

[9] MetLife has a structural conflict of interest in that it both evaluates claims and pays benefits.  *See* Doc. 35 at 11-12; *see also Glenn*, 128 S. Ct. at 2346.

[10]  In my view, the timeliness issue is only relevant for evaluating the conflict-of-interest component of the analysis.  That MetLife weighed Plaintiff's evidentiary submissions after its initial decision denying benefits and then decided the Plaintiff's claim on the merits of her evidence counters any argument that MetLife's conflict of interest factored into its decision.

*3. MetLife's reimbursement claim*

MetLife, pursuant to 29 U.S.C. §1132(a)(3), seeks reimbursement for its overpayment of disability benefits that occurred due to Plaintiff's receipt of Social Security benefits.[11] Plaintiff argues MetLife's claim fails because: (1) MetLife has failed to prove the amount due to it; (2) MetLife's argument is barred by 42 U.S.C. § 407, which protects Social Security funds from "execution, levy, attachment, garnishment, or other legal process"; and (3) Plaintiff no longer has long-term disability or Social Security funds in her possession. I find the first two weigh in MetLife's favor. The last one, which is supported by Plaintiff's affidavit, makes any recovery legally impossible. *See infra Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).

---

[11] The Plan documents state:

When you do receive approval of your claim from any of the sources listed in item **1.** of the "List of Sources of Other Income Benefits" below:

1.  your Monthly Benefit will be reduced from that point on by the amount of benefits you receive from any such sources each month; and

2.  you must promptly refund to us from any lump sum retroactive payment received from any such sources, an amount equal to any overpayment which resulted from any period in which we were entitled to, but did not, reduce your Monthly Benefit. You must notify us that you have received such lump sum payment within 10 days of receiving it. We will notify you of the overpayment amount you must refund to us, and where to send it, within 10 days of receipt of your notice. You must send us such overpayment amount within 30 days of your receipt of our notice of the amount of overpayment due.

If you do not make such refund to us within the 30 day period, we may, at our option, reduce or offset against any future benefits payable to you. However, this does not change the requirement that you must refund the full amount of the overpayment to us at once.

Doc. 34, Ex. D at 9. Other Income Benefits in Item 1 include Social Security benefits. *Id.*

*a. the amount and the application of § 407*

Plaintiff contends MetLife cannot succeed on its overpayment counterclaim because it has "offered no proof as to the specific amount of any alleged offset that it may claim." As MetLife points out, Plaintiff, in her Rule 26 initial disclosure, produced a document indicating that she received $2,007 in Social Security disability benefits monthly in 2007. MetLife reasonably argues the total amount of Social Security benefits Plaintiff received for the period during which she also received long-term disability benefits can be calculated by making cost-of-living adjustments to the 2007 payment amount.

Plaintiff next argues MetLife's counterclaim is barred by 42 U.S.C. § 407.[12] Plaintiff argued this point in her motion to dismiss: "MetLife seeks to recover funds received under the Social Security Act, which funds are protected from 'execution, levy, attachment, garnishment, or other legal process.'" (Doc. 28 at 4) The district judge, however, rejected her contention: "[T]he better reasoned opinions that have addressed this issue hold that § 407(a)'s prohibition is not triggered by this kind of reimbursement provision because the insurance company seeks the amount it overpaid the claimant rather than any of the claimant's Social Security benefits." Doc 28 at 5 (punctuation and citations omitted). In short, that conclusion is the law of the case and controls. *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988) (the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.")

---

[12] Section 407(a) provides in pertinent part: " The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."

*b. an identifiable fund*

Lastly, Plaintiff argues MetLife cannot recover on a cause of action under 29 U.S.C. § 1132(a)(3) because there is no fund in existence against which a lien by agreement can be executed. She contends any relief would have to be in the form of a personal judgment, a remedy not available under Section 1132(a)(3). MetLife counters by asserting to bar recovery in cases like this would: (1) be inconsistent with the policy of ERISA; and (2) result in harm to plan participants in that a plan may opt not to give the higher monthly benefit pending a Social Security determination or opt to increase the cost of long-term disability coverage. MetLife has not, however, cited any authority for permitting a Section 1132(a)(3) claim when there is no identifiable fund currently in the beneficiaries' possession.

Section 1132(a) provides: "A civil action may by brought…(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate *equitable* relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3) (emphasis added).

In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court addressed Section 1132(a)(3) in the context of an action to enforce a reimbursement provision of an ERISA plan. The plan beneficiaries in *Knudson* received plan benefits for the beneficiary wife's medical expenses and then filed a tort action in state court to recover from the manufacturer of the car the wife was riding in at the time of her accident. *Id.* at 207. The funds recovered in the tort action were paid into a Special Needs Trust and to the beneficiaries' attorney. *Id.* The assignee of the plan filed an action in federal court seeking injunctive and

declaratory relief under Section 1132(a)(3) "to enforce the reimbursement provision of the Plan by requiring the Knudsons to pay the Plan $411,157.11 of any proceeds recovered from third parties." *Id.* at 208.

The Court stated whether restitution "is legal or equitable depends on the basis for the plaintiff's claim and the nature of the underlying remedies sought." *Id.* at 213 (punctuation and citation omitted). "[F]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214. Because the "funds to which petitioners claim[ed] an entitlement under the Plan's reimbursement provision – the proceeds from the settlement of respondents' tort action – [we]re not in respondents' possession," the Court held the fiduciaries could not maintain their action under § 1132(a)(3):

> The basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred. The kind of restitution that petitioners seek, therefore, is not equitable – the imposition of a constructive trust or equitable lien on particular property – but legal – the imposition of personal liability for the benefits that they conferred upon respondents.

*Id.* at 214.

In *Sereboff v. Mid Atlantic Medical Servs., Inc.*, 547 U.S. 356 (2006), the Supreme Court again considered the viability of an action brought under Section 1132(a)(3) by a plan fiduciary to obtain reimbursement in light of a beneficiary's recovery from third parties. The beneficiaries in *Sereboff* were in an automobile accident and received plan benefits for their medical expenses. *Id.* at 360. The beneficiaries filed a tort action in state court, which they settled for $750,000. *Id.* Pursuant to the plan's reimbursement provisions, the plan administrator sought in federal court to

collect the medical expenses they had paid under the plan.  *Id.*  The district court approved a stipulation by the parties under which the beneficiaries agreed to put $74,869.37 of the settlement funds into an investment account until the conclusion of the case.  *Id.*  The district court ruled in favor of the fiduciaries and the court of appeals affirmed.  *Id.* at 360-61.

On certiorari, the Supreme Court considered whether the relief sought by the fiduciaries was available under Section 1132(a)(3).  547 U.S. at 361.  The Court concluded it was.  The Court first recognized that the impediment present in *Knudson* was not present in *Sereboff* – the nature of the recovery the fiduciaries sought was equitable:

> [Fiduciaries] sought "specifically identifiable" funds that were "within the possession and control of the Sereboffs" – that portion of the tort settlement due Mid Atlantic under the terms of the ERISA plan, set aside and "preserved in the Sereboffs' investment accounts." 407 F.3d[] at 218.  Unlike Great-West, Mid Atlantic did not simply seek "to impose personal liability for a contractual obligation to pay money."  *Knudson*, 534 U.S. [] at 210…This Court in *Knudson* did not reject Great-West's suit out of hand because it alleged a breach of contract and sought money, but because Great-West did not seek to recover a particular fund from the MetLife.  Mid Atlantic does.

*Id.* at 362-63 (punctuation omitted) .  The Court then looked at the basis of the claim, and concluded the basis for the fiduciaries' claim was equitable in that it sought enforcement of an equitable lien by agreement.  *Id.* at 363-65.  The Court therefore held the fiduciaries' claim was properly brought under Section 1132(a)(3).  *Id.* at 369.

Subsequent to *Knudson* and *Sereboff*, the Eleventh Circuit considered a reimbursement claim brought under Section 1132(a)(3) where the majority of funds recovered from a third party were held in a trust account but the plan administrator named the conservator as a defendant. *Administrative Comm. for Wal-Mart Stores, Inc. Assocs.' Health and Welfare Plan v. Horton*, 513 F.3d 1223 (11th Cir.), *reh'g and reh'g en banc denied*, 277 Fed. Appx. 979 (11th Cir. 2008).

In holding the plan administrator's claim proper under Section 1132(a)(3), the Eleventh Circuit summarized the Supreme Court's precedent as follows:

> Under *Knudson* [and] *Sereboff* …the most important consideration is not the identity of the defendant, but rather that the settlement proceeds are still intact, and thus constitute an identifiable *res* that can be restored to its rightful recipient. Had the Administrative Committee solely sued parties not in possession of the disputed funds, the claim would have failed under *Knudson* because it merely would have sought to impose personal liability on those parties. Instead, the Administrative Committee also sued [the mother] in her capacity as conservator of [the son's] special needs trust, seeking restoration of that particular fund in which it asserts a paramount interest.

*Id.* at 1229. Thus, Supreme Court and Eleventh Circuit precedent requires that in order to succeed on a Section 1132(a)(3) claim, MetLife must identify intact funds in possession of Plaintiff, the counterclaim defendant.

The only evidence before the Court on the issue of whether there is an identifiable fund in existence as to which MetLife has a claim under Section 1132(a)(3) is Plaintiff's declaration stating she does "not have any of the funds paid to [her] by METLIFE from March 2003 through March 1, 2006;" she "no longer ha[s] any of the past due benefits paid to [her] by Social Security in 2007, because those funds were used to pay past-due bills and expenses as well as debt that was incurred from the time [her] LTD benefits were cut off in March 2006 to the time [she] received the Social Security payments;" and the "only funds [she] *will* have to satisfy any judgment entered in this case would be [her] monthly Social Security Disability checks." (Doc. 43 at 2 (emphasis added))

At oral argument, MetLife stated it had not conducted discovery on the issue of the existence of an identifiable fund. It took the position that the Court should enter judgment in its favor on the reimbursement claim and then permit it to conduct discovery in aid of execution to

determine whether there is an identifiable fund as to which it has a claim under Section 1132(a)(3).  MetLife puts the cart the before the horse.  The discovery MetLife seeks here will determine *whether* it is entitled to bring a Section 1132(a)(3) claim fruition, *i.e.*, to judgment.  As such, the discovery MetLife requests should have been taken during the regular discovery period, which closed in May 2009.[13]

As there is no evidence (and certainly no undisputed evidence) of the existence of an identifiable fund in Plaintiff's possession as to which MetLife can bring a claim under Section 1132(a)(3), MetLife's motion for summary judgment should be denied as to its reimbursement counterclaim.  In fact, based on the evidence before the Court, it would be appropriate to enter judgment in favor of Plaintiff on the reimbursement counterclaim.[14]  This is so even though Plaintiff's motion for summary judgment does not encompass MetLife's reimbursement counterclaim.  *See Massey v. Congress Life Ins. Co.*, 116 F.3d 1414, 1417 (11th Cir. 1997) ("District courts unquestionably possess the power to trigger summary judgment on their own initiative." (Citations omitted)).

Based on the foregoing, it is hereby

---

[13] The Court notes the Middle District Discovery Handbook provides that "the discovery completion date is normally extended only upon a written motion showing good cause (including due diligence in the pursuit of discovery before the completion date)."  Middle District Discovery (2001) at I.F.2.  MetLife has not moved to extend the discovery deadline in this case.

[14] Although MetLife represented at oral argument that the facts set out in Plaintiff's affidavit are contested, a party may not establish a genuine issue of material fact simply by asserting at oral argument that such an issue exists.  *Cf.* Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial.").

RECOMMENDED:

1.  Plaintiff's motion for summary judgment (doc. 37) be DENIED;

2.  Defendant's motion for final judgment (doc. 35) be GRANTED as to Plaintiff's claims, but DENIED as to Defendant MetLife's reimbursement counterclaim brought under 29 U.S.C. § 1132(a)(3);

3.  Judgment be entered in favor of Defendant MetLife on Plaintiff's benefits and accounting claims; and

4.  Judgment be entered in favor of Plaintiff on MetLife's reimbursement counterclaim.

IT IS SO REPORTED in chambers at Tampa, Florida on December 29, 2009.


Mark A. Pizzo

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).


cc:     The Honorable Steven D. Merryday
        Counsel of Record